UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/9/2019

-----------------------------------------------------------X
                                             :

AUTOMATED IRRIGATION CONTROLS,  :
LLC,                                       :

                                :

                          Plaintiff,  :               1:18-cv-2435-GHW

                                :

             -against-          :       MEMORANDUM OPINION

                                :          AND ORDER

THE WATT STOPPER, INC and LEGRAND :
NORTH AMERICA, INC.                    :

                                :

                        Defendants.  :

                                :

----------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      Plaintiff Automated Irrigation Controls ("AIC") sues for breach of contract, claiming that

Defendant Watt Stopper, Inc. ("Watt Stopper") has failed to pay royalties to which Plaintiff

contends it is contractually entitled. The governing contract, however, contains a self-executing

clause that, absent waiver or other modification, terminated Watt Stopper's royalty obligations. The

contractual language at issue is clear and unambiguous, and consistent with the law of New York, is

to be enforced according to its terms. However, as material issues of fact persist as to whether the

contractual framework was modified by waiver, the Court cannot conclude on the record before it

that Watt Stopper's royalty obligations have terminated. As a result, for the reasons that follow,

Watt Stopper's motion for summary judgment is GRANTED IN PART and DENIED IN PART

and AIC's motion for summary judgment is DENIED.

## I.    BACKGROUND

### A. Undisputed Facts

Watt Stopper markets and sells lighting control products. AIC developed certain wireless

outdoor lighting control products.[1]  At or around November 12, 2013 Watt Stopper and AIC

entered into the technology licensing agreement (the "TLA") that is the subject of this dispute.

Counterclaim Statement of Undisputed Facts ("CC 56.1"), Dkt. No. 130 ¶ 1; TLA, Dkt. No. 95-1 at

1 (noting Nov. 11, 2013 as the effective date).  Legrand North America, LLC. ("Legrand") is the

guarantor of Watt Stopper's obligations under the TLA.[2]  TLA § 2(K).  Bryan Pike, as Vice-

President of AIC, executed the TLA on AIC's behalf.  TLA at 11.

The TLA granted Watt Stopper an exclusive license to exploit certain patents, patent

applications, and technologies developed by AIC in exchange for the payment of royalties to AIC on

the sale of "Royalty Bearing Products," as defined in the TLA.  TLA 1-4.  "Royalty Bearing

Products" were defined as:

> . . . the products set forth in Exhibit A and functional [sic] equivalent successor
> products.  As used in the preceding sentence "functionally equivalent successor
> products" means (i) products on Exhibit A that are re-named or re-branded without
> material change to their features or functionality, (ii) products that are re-
> configurations of the same technology (same feature/functionality) as products on
> Exhibit A but not (iii) battery operated single digital or analog input or "single point"
> products.

TLA § 2(D).

 Because Watt Stopper "desire[d] to employ certain individuals previously employed by

AIC," TLA, Recitals at 1, the TLA anticipated that certain persons who were employed by AIC at

the time the TLA was executed would be offered employment at Watt Stopper.  That Watt Stopper

---

[1] The Amended Complaint names "The Watt Stopper, Inc." as a defendant, and Defendant consistently uses the name "Watt Stopper" to describe itself.  Accordingly, the Court adopts that convention.  The Court notes, however, that the party to the TLA is "The Wattstopper, Inc."  TLA at 1.  As no party contends that discrepancy is material, the Court continues its analysis assuming that it is not.

[2] The Amended Complaint, names Legrand North America, Inc. as a defendant, and Legrand North America, Inc. is listed as Watt Stopper's guarantor in the TLA.  However, the Legrand entity which has appeared is, in actuality, Legrand North America, LLC.  See Corporate Disclosure Statement, Dkt. No. 42; Answer and Counterclaims, Dkt. No. 53.  As discussed below, no claims remain against Legrand in any event.

anticipated hiring those employees, and the implications of any violations of those employees'

employment agreements with Watt Stopper, were embodied in the text of the TLA.

> . . . because the know-how associated with the Licensed Technology is anticipated to
> be shared hereunder by certain key persons currently employed by AIC but
> anticipated hereunder to be offered employment by [Watt Stopper], it shall be a
> condition hereunder that AIC hereby acknowledge and agree, notwithstanding the
> Royalty Period (defined below) and any other conflicting or potentially conflicting
> provision herein, that if any of Bryan Pike, Joe Dylinski, or Zane Brown resigns from
> their employment with Wattstopper without Wattstopper's consent prior to the third
> anniversary of the Effective Date, or breach their employment obligations, including
> without limitation their respective "no conflict of interest" and "non-compete"
> terms and conditions, then as of that date sales by [Watt Stopper] of Royalty Bearing
> Products will be royalty free and all licenses granted by AIC hereunder will be fully
> paid.

TLA at 3 (the "Conditions on Royalties Clause"); TLA § 3 ("In connection with [the TLA],

Wattstopper shall extend offers of employment to current AIC employees Bryan Pike, Joe Dylinski,

Zane Brown, and Nathan Wood.")

Joe Dylinski and Bryan Pike both executed employment agreements with Watt Stopper on

November 12, 2013. Dylinski Agreement, Dkt. No. 95-8 ; Pike Agreement, Dkt. No. 95-7,

(collectively, the "Employment Agreements"). Section 3.3 in both Employment Agreements are

identical, and both state that:

> . . . . Employee further agrees to divest any and all ownership interest in Digital
> Contracting Solutions (DCS) and provide [Watt Stopper] with satisfactory evidence
> of the divestiture within six months of this Agreement's effective date. Employee
> further agrees to cease his participation in the operations of AIC, DCS, or any
> company with which [Watt Stopper] or its Affiliates is expected to do business in
> performance of obligations under either the technology license agreement or OEM
> agreement. If employee fails to fulfill the obligations set forth in this [section], his
> employment will be terminated immediately for "Cause," and Employee shall be
> entitled to no further payments and benefits under any provision of this Agreement
> (other than for accrued unused vacation).

Employment Agreements § 3.3 (the "Conflict of Interest Clauses").

Neither Pike nor Dylinski ever divested their interests in DCS; nor, consequentially, did they

provide proof of such divestiture.  Statement of Undisputed Facts ("56.1"), Dkt. No. 121 ¶¶ 17, 18

(neither man "divest[ed] his ownership interest in DCS because [they] could not.").  Peter Horton

was the primary representative of Watt Stopper in negotiating the TLA.  56.1 ¶ 2.  On June 11, 2013,

Pike wrote an email to Horton, copying Dylinski, in which he stated that:  "Per the license

agreement, AIC needed to show full divestiture of DCS by now.  What do we need to do if anything

to comply?"  56.1 ¶ 19.  Horton subsequently forwarded the email to Jim Young, a Watt Stopper

executive.  *Id.*  Young informed Horton that he "should ask Pike and Dylinski for an executed copy

of the DCS sale agreement."  *Id.*  Horton "forwarded [that] email to Pike, advising him to 'see

below' for Young's request."  *Id.*  As described above, however, neither Dylinski nor Pike divested

their DCS holdings, nor provided proof of divesture.  56.1 ¶¶ 17, 18.

The TLA is governed by the law of the State of New York, without regard to New York's

conflict of laws principles.  TLA § 15.  The Agreement contains an anti-waiver provision which

states that "[n]o waiver by either Party of any default shall be deemed as a waiver of prior or

subsequent default of the same of [sic] other provisions of this Agreement."  TLA § 19.  The

Agreement is fully integrated, and its terms prohibit modification or amendment of the TLA except

in writing.  The relevant provision states:

> This Agreement constitutes the full understanding of the Parties and a complete
> statement of the terms of their agreement with respect to the subject matter hereof
> and supersedes and cancels all prior agreements, correspondence, undertakings and
> communications of the Parties, oral or written, respecting such subject matter.  Each
> Party acknowledges that it is entering into this Agreement without relying on any
> promise by another Party that is not expressly set forth in this Agreement.  *This
> Agreement cannot be modified or amended except in writing signed by both Parties* and
> specifically referring to this Agreement.

TLA § 23, (the "Written Modifications Only Clause") (emphasis added).[3]

---

[3] For ease of reference, additional facts specifically pertinent to the purported 2018 breach of Pike's Employment
Agreement in 2018 are provided in § II(B), below.

## B. Procedural History

This case was filed on March 19, 2018. Dkt. No. 1. The Amended Complaint was served on May 31, 2018. Dkt. No. 39 ("AC"). In the Amended Complaint, Plaintiff pleaded three causes of action. Counts I and II alleged breaches of the TLA by Watt Stopper. In Count I, Plaintiff alleged that Watt Stopper "failed to use reasonable efforts to exploit [the exclusive] license" granted in the TLA. AC ¶¶ 47-52. In Count II, Plaintiff alleged that Watt Stopper failed to make royalty payments on "functionally equivalent successor products to the Royalty Bearing Products." AC ¶¶ 53-58. In Count III, Plaintiff alleged that Legrand tortiously interfered with the TLA "by taking action to prevent Watt Stopper from using its reasonable and best efforts to exploit the exclusive license." AC ¶¶ 59-65.

On June 28, 2018, Watt Stopper served a motion to dismiss Count I of the Amended Complaint. Dkt. No. 55. That same day, Legrand served a motion to dismiss Count III of the Amended Complaint, the only count which directly implicated Legrand.[4] On October 26, 2018, the Court granted Legrand's motion to dismiss and denied Watt Stopper's motion to dismiss. Dkt. No. 83. AIC was granted leave to serve a second amended complaint no later than November 9, 2018. AIC never served a second amended complaint. Accordingly, only Counts I and II of the Amended Complaint remain at issue in this case.

Watt Stopper's Answer and Counterclaims were served on June 25, 2019. CCs, Dkt. No. 53. In Count I of the Counterclaims, Watt Stopper seeks, *inter alia*, declaratory judgment that as of the date of the breach of Pike's and Dylinski's Employment Agreements, all sales of Royalty Bearing Products were royalty-free and all licenses granted under the TLA were fully paid. *Id.* ¶¶ 28-39.

---

[4] The Court need not reach the import of Legrand's status as Watt Stopper's guarantor under the TLA in the present opinion and takes no position on that issue.

Watt Stopper additionally seeks declaratory judgment that it is entitled to the return of all Watt Stopper's property in Pike's or AIC's possession, custody, or control. *Id.* ¶ 39. In Count II of the Counterclaims, Defendants allege that AIC tortiously interfered with Pike's and Dylinski's Employment Agreements—inducing both men to breach their Employment Agreements and damaging Watt Stopper. *Id.* ¶¶ 40-47.

Before the Court are cross-motions for summary judgment. Watt Stopper has moved for summary judgment on all counts in the Amended Complaint, and for partial summary judgment in its favor as to Count I of its Counterclaims.[5] Dkt. No. 92. AIC has moved summary judgment as to all counts of the Counterclaims.[6] Dkt. No. 97. Both motions are fully briefed and ripe for adjudication.

## II. STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are

---

[5] As no claims remain against Legrand, Legrand did not participate in this round of motion practice.

[6] On February 15, 2019 Watt Stopper served a motion for evidentiary sanctions and associated relief. Dkt. No. 138. The Court denied that motion on August 19, 2019. Dkt. No. 149.

irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted). However, if "no rational finder of fact 'could find in

7

favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

In resolving cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

## III. DISCUSSION

### A. Purported Breaches of the Employment Agreements in 2014

For the reasons that follow, the undisputed evidence comes to the precipice of establishing that no later than May 13, 2014, "sales by [Watt Stopper] of Royalty Bearing Products [were] royalty free and all licenses granted by AIC hereunder [were] fully paid." TLA at 4. Ultimately, however, questions of material fact remain as to whether Watt Stopper waived its right to benefit from the Conditions on Royalties Clause, and accordingly the Court cannot, on this record, conclude that Watt Stopper's royalty obligations terminated in May 2014.

Under New York law,[7] "[i]t is well settled that a contract is to be construed in accordance

---

[7] The Employment Agreements are governed by the law of Georgia. Employment Agreement § 5.7. No party, however, has presented an argument that the law of Georgia applies here, or analyzed the contracts applying Georgia law. Where "[t]he parties' briefs assume that New York substantive law governs the issues . . . such implied consent is . . . sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)); *see also Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 323 (S.D.N.Y. 2014) (collecting cases). Furthermore, the law of Georgia, like New York law, looks first to the four corners of the agreement to discern the intent of the parties. *Wolf Creek Landfill, LLC v. Twiggs Cty.*, 337 Ga. App. 211, 214-15 (2016) ("The cardinal rule of [contract] construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction.") (alteration in original) (quotation omitted); *Livoti v. Aycock*, 263 Ga. App. 897, 901-02, (2003) ("The first step is to look to the four corners of the instrument to determine the intention of the parties from the language employed. . . . [O]nly if [an] ambiguity is not resolved by application of the rules of construction may parol evidence be introduced to explain the agreement."). Accordingly, in the absence of any contention that there is a germane conflict between the law of Georgia and the law of New York, the Court applies the law of New York, except as otherwise indicated.

with the parties' intent, which is generally discerned from the four corners of the document itself." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002) (quoting *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992)). "Consequently, 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *Presstek*, 12 N.Y.3d at 645 (quoting *Greenfield*, 98 N.Y.2d at 562).

The Conditions on Royalties Clause contains clear and unambiguous language regarding the impact of a breach of the Conflict of Interest Clauses of the Employment Agreements on the TLA. In the case of such a breach, "then *as of that date* sales by [Watt Stopper] of Royalty Bearing Products will be royalty free and all licenses granted by AIC hereunder will be fully paid." TLA at 3 (emphasis added). A review of the Conditions on Royalties Clause's clear and unambiguous language reveals three features pertinent to this analysis. First, it is self-executing.[8] In the event that either Pike or Dylinski breached his respective Employment Agreement, this provision would automatically be triggered, without the need for an affirmative act on the part of Watt Stopper. Second, it is triggered on the date of the breach of an Employment Agreement. And third, it does not terminate the TLA in the event it is triggered. In sum, the Conditions on Royalties Clause is clearly and unambiguously drafted so that it is triggered automatically on the date that either Mr. Pike or Mr. Dylinski breached their respective Employment Agreement, with the effect of terminating Watt Stopper's royalty obligations and rendering the licenses granted fully paid without the need for any affirmative action on the part of Watt Stopper.

---

[8] AIC contends that this provision is a condition subsequent, and therefore cannot be self-executing because a party "must perform some additional act in order to terminate the contract." *In re St. Casimir Dev. Corp.*, 358 B.R. 24, 39 (S.D.N.Y. 2007). Such authority is inapposite here as the Conditions on Royalties Clause does not even purport to provide Watt Stopper with the right to terminate the TLA if triggered—much less terminate the TLA itself.

Pike and Mr. Dylinski executed their Employment Agreements on November 12, 2013. Pike Agreement at 2; Dylinski Agreement at 2. The Conflict of Interest Clauses of those agreements require, *inter alia*, that both men "divest any and all ownership interest in Digital Contracting Solutions (DCS) and provide [Watt Stopper] with satisfactory evidence of the divestiture within six months of [the] Agreement's effective date." Employment Agreements § 3.3. It is undisputed that neither man ever divested his interest in DCS. Accordingly, by May 13, 2014, Pike and Dylinski had both breached the Conflict of Interest provisions of their respective Employment Agreements. Absent a modification of the contractual framework, those breaches triggered the Conditions on Royalties Clause—with the consequence that, as of May 13, 2014, "sales by [Watt Stopper] of Royalty Bearing Products [were] royalty free and all licenses granted by AIC hereunder [were] fully paid." TLA at 3.

AIC does not contend that Pike or Dylinski ever divested their DCS holdings or provided proof of their divestiture. Nor has AIC adduced evidence that it has suffered any damages if Watt Stopper's royalty obligations terminated on May 12, 2014. 56.1 ¶ 20. Rather, AIC contends that principles of waiver and estoppel counteract the contractual mechanisms described above.

For the reasons that follow, the Court cannot, on this record, determine that there is no question of material fact as to the issue of contractual modification by waiver, which precludes the Court from determining at this time whether Watt Stopper's royalty obligations terminated as of May 13, 2014.

### 1. Amendment of the TLA

"Under New York law, parties may modify a contract by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (internal quotation marks and citation omitted). However, as

discussed above, the TLA contains the Written Modifications Only Clause, which states, in pertinent part, that the TLA "cannot be modified or amended except in writing signed by both Parties and specifically referring to this Agreement." TLA § 23. This provision is enforceable under N.Y. Gen. Oblig. Law § 15-301(1) ("§ 15-301") which "places this type of clause on the same footing as any other term in a contract." *Israel v. Chabra*, 12 N.Y.3d 158, 167 (2009); *see HGT Capital LLC v. HDS Int'l Corp.*, 60 Misc. 3d 1225(A), 1225(A) (N.Y. Sup. Ct. 2018) ("The defense of waiver is also inapplicable, as the Note contains a no-oral-modification clause.").

"Despite § 15-301, New York recognizes oral modification or waiver of a contractual provision, but only under limited circumstances, specifically, (1) 'when there has been partial performance of an agreement to modify, so long as the partial performance is unequivocally referable to the oral modification,' or (2) 'when one party has induced the other party to rely on an oral modification' such that 'the first party may be equitably estopped from invoking the requirement that any modification be in writing.'" *DiStefano v. Maclay*, 102 F. App'x 188, 189 (2d Cir. 2004) (summary order) (quoting *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990)).

### a. Waiver by Partial Performance

For the reasons that follow, there is a question of material fact regarding the application of the waiver by partial performance exception to § 15-301. As a result, on this record, the Court cannot determine whether Watt Stopper's royalty obligations terminated on May 13, 2014.

Under New York law, "[p]artial performance of an oral agreement to modify a written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing." *Gun Hill Rd. Serv. Station, Inc. v. ExxonMobil Oil Corp.*, 08-cv-7956-PKC, 2013 WL 395096, at *5 (S.D.N.Y. Feb. 1, 2013) (alteration in original) (quoting *Rose v. Spa Realty Assocs.*, 42 N.Y.2d

338, 341 (1977)). "If the conduct that allegedly constituted partial performance of the oral agreement to modify was in fact compatible with the original agreement, the oral agreement will not be enforced." *Towers Charter & Marine Corp.*, 894 F.2d at 522.

It is undisputed that Watt Stopper continued to pay AIC royalty payments, despite Pike's and Dylinski's failure to divest their DCS holdings.[9] 56.1 ¶ 76; *see* CC 56.1 ¶ 51. Those continued payments may constitute partial performance of a modification of the TLA—and accordingly are consistent with AIC's contention that the TLA was modified by waiver. The question before the Court is whether there is a question of material fact as to whether those payments are unequivocally referable to a potential modification of the TLA.

On this record, the Court cannot conclude that there is no question of material fact regarding whether Watt Stopper's continued payment of royalties is unequivocally referable to a modification of the TLA. Watt Stopper contends that because its obligation to pay royalties was imposed by the TLA, its continued payment of royalties cannot be unequivocally referable to a modification of the TLA. Watt Stopper's Reply, Dkt. No. 134 at 5 ("[T]he partial performance alleged by MTS was the payment of money, which it was already required to do under the original agreements." (alteration in original) (quoting *Am. Int'l Tel., Inc. v. Mony Travel Servs., Inc.*, 99-cv-11581-CM-LMS, 2001 WL 209918, at *4 (S.D.N.Y. Feb. 23, 2001))). That argument is flawed, however, for the basic reason that, absent a modification of the contract, the TLA did not require Watt Stopper to make payments after May 12, 2014. Royalty payments after that date were not required under the original agreement—that is, unless it was modified. This is the only argument presented

<hr/>

[9] There is a disputed issue of fact as to whether Horton informed Pike and or Dylinski that no divestiture was required. Dylinski testified at his September 5, 2018 deposition that he had spoken about the requirement of divesture with Horton, and that Horton told him that "it would not be an issue" that Mr. Dylinski had not divested his DCS holdings. Sept. 5, 2018 Dep. of Joe Dylinski, Dkt. No. 99-3 at 77:1-11. Mr. Horton denies having had any such conversation. Sept. 13, 2018 Dep. of Peter J. Horton, Dkt. No. 112-1, 113:35-114:17.

by Watt Stopper on this point—the only egg that it placed in this basket—and it is profoundly flawed because the continued stream of royalty payments was not required by the contract as written. Given that Watt Stopper has not presented alternative explanations of the continued payment stream, the Court cannot determine, on this record, that there is no question of material fact regarding whether the continued payment of royalties is unequivocally referable to a modification of the TLA.

Watt Stopper has not presented alternative explanations for the continued royalty payments in briefing this motion to dismiss. Despite that failure, however, the Court notes in dicta that other explanations for the continued payment of royalties may ultimately call into question whether those payments were unequivocally referable to a modification of the TLA.[10] In *Gun Hill*, Judge Castel explained that, in the context of a § 15-301 analysis, actions that are "consistent with an oral modification" but that are "just as easily explained as an attempt to improve a strained business relationship" are not unequivocally referable to a putative-contractual modification. *Gun Hill*, 2013 WL 395096, at *5. The evidence indicates that Watt Stopper anticipated benefiting from the "know-how" of the AIC employees it hired in parallel with the execution of the TLA, TLA at 3, and believed that it would "further the purposes of the [TLA]" if certain AIC employees were hired by Watt Stopper. Employment Agreements, Recitals. Accordingly, the Court notes the possibility that the payments made by Watt Stopper were, in fact, voluntary payments made not due to an obligation in the TLA, but to maintain the good will of the AIC employees who, at that time, were

---

[10] The Court notes in dicta that Watt Stopper's arguments here, including their counterclaims, may cut against their position with respect to the question of whether the payments are unequivocally attributable to a modification. In its counterclaims, Watt Stopper seeks, *inter alia*, damages under a theory of tortious interference with contract—and contends that AIC's alleged tortious interference with the Employment Agreements was the proximate cause of Watt Stopper's overpayment of royalties to AIC. *See* Watt Stopper's Reply, Dkt. No. 110 at 25. Watt Stopper's characterization of the damages it seeks in its counterclaims as overpayment of royalties is difficult to square with any potential alternative explanation for those payments.

employed by Watt Stopper. *See* 56.1 ¶ 120. Other potential alternative rationales for the continued payment of royalties may exist. However, Watt Stopper failed to present any such alternative rationales for the continued payments, relying instead on one argument, which suffers from the flaws described above.

For all these reasons, the Court concludes that there is a question of material facts as to whether the royalty payments made by Watt Stopper on or after May 13, 2014 are unequivocally referable to Watt Stopper's waiver of the Conditions on Royalties Clause. Accordingly, the Court cannot conclude that Watt Stopper's obligation to pay royalties terminated on May 12, 2014. Nor, however, can the Court conclude that Watt Stopper's Royalty obligation necessarily survived beyond that date. Consequentially, both pending motions for summary judgment are denied to the extent that those motions are premised on a determination of that issue.

### b. Estoppel

The Court need not reach this issue, as it has already determined that a question of material fact exists as to whether Watt Stopper's royalty obligations persisted past May 13, 2014. However, in dicta, the Court notes that AIC's estoppel arguments appear to be flawed in that AIC has not presented any evidence of detrimental reliance on any act taken by Watt Stopper.

In order to benefit from the estoppel exception to §15-301, a party must demonstrate, *inter alia,* "acts taken in detrimental reliance" on the conduct at issue, which in turn must be "unequivocally referable'" to the modification of the agreement. *Richardson & Lucas, Inc. v. N.Y. Athletic Club of City of New York*, 758 N.Y.S.2d 321, 322 (1st Dep't 2003) (quoting *Rose*, 42 N.Y.2d at 343). AIC, however has not adduced evidence of any specific acts it took in detrimental reliance on the receipt of payments which, had the TLA been strictly enforced according to its terms, it may not have been entitled to receive.

14

Despite lacking factual support in the record, AIC made the following arguments in support of its purported detrimental reliance. First, that "AIC relied on [Watt Stopper's] actions in continuing to sell the licensed products and pay AIC royalties owed on those products." AIC's Opp. to S.J., Dkt. No. 98 at 7-8. And second, that "[h]ad [Watt Stopper] timely insisted on its rights, AIC could have taken steps at the time to remedy any purported breaches." AIC's Reply in Support of S.J., Dkt. No. 129 at 3. Neither argument is supported by record evidence. In addition, AIC's first argument is inadequate in that it does not even purport to identify any detrimental acts taken by AIC in reliance on Watt Stopper's continued payment of royalties. Absent modification of the contractual framework, Watt Stopper's royalty obligation terminated no later than May 13, 2014. AIC has not explained how the receipt of payments which Watt Stopper may not have been obligated to make caused AIC to rely on those payments to its detriment, let alone adduced evidence supporting any such contention.

As for AIC's second argument, the Court notes that it appears to be in tension with AIC's admission that neither Pike nor Dylinski were capable of divesting their DCS holdings—which begs the question of how AIC could have cured Pike's and Dylinski's failure to timely divest.[11] 56.1 ¶ 17 ("Mr. Pike did not divest his ownership interest in DCS because he could not."), ¶ 18 ("Mr. Dylinski did not divest his ownership interest in DCS because he could not."). Additionally, AIC's second argument fails to identify any of Watt Stopper's actions upon which AIC is purported to have detrimentally relied. Ultimately, however, the Court need not reach this issue and provides the

---

[11] The Court notes that this tension is aggravated by AIC's contention that the disputed conversations between Horton, Pike and Dylinski as to Pike's and Dylinski's obligation to divest their DCS holdings do not constitute oral amendments of the TLA. *See* AICAIC's Reply, Dkt. No. 129 at 1 ("AIC does not argue that there was an oral modification (or oral wavier) to any agreement."). Assuming, *arguendo*, that such testimony could be interpreted as indicative of one or more oral agreements which amended the contractual framework to obviate the need for Pike or Dylinski to divest their DCS holdings, then AIC's failure require a written amendment might be considered an act taken in detrimental reliance on the statements which led AIC to believe that no written amendment was necessary. *See* § II(A)(2), below.

above analysis merely as dicta.

## 2. Amendment of the Employment Agreements

The Court understands that AIC contends that the TLA, rather than the Employment Agreements themselves, was modified by the parties. That position seems sensible in light of the record evidence of the timing of the purported conversations between Dylinski and Horton.

The Employment Agreements, unlike the TLA, are governed by the law of Georgia. Employment Agreements § 5.7. Accordingly, any amendment of the Employment Agreements would be considered outside the ambit of § 15-301, which is a creature of New York law.

As dicta, the Court notes that, even construing the facts in the light most favorable to AIC, the record indicates that any amendment of the Employment Agreements would have occurred in "the last quarter of 2014." Dylinski Tr. at 77:9-11. As discussed above, Pike and Dylinski were obligated to divest their DCS holdings no later than May 12, 2014. Accordingly, on this record, the Court could not conclude that any amendment of the Employment Agreements based on purported conversations between Dylinski and Horton occurred prior to the self-execution of the Conditions on Royalties Clause. Therefore, it appears that any such amendment of the Employment Agreements would have occurred too late in time to prevent the Conditions on Royalties Clause from being triggered. However, as the Court need not reach this issue, it ultimately takes no position on it.

## B. Purported Breach of Pike's Employment Agreement in 2018

AIC has moved for summary judgment on Watt Stopper's counterclaims, to the extent that those claims are premised on a purported breach of Pike's Employment Agreement in 2018.[12] AIC's

---

[12] Watt Stopper has not moved for summary judgment in its favor as to this aspect of its counterclaims regarding Pike. Watt Stopper's Br., Dkt. No. 93 at 20. Accordingly, as AIC is the movant as to this issue, the facts in this section are presented in the light most favorable to Watt Stopper. *Johnson*, 680 F.3d at 236.

motion for summary judgment is denied in that respect, for the reasons that follow.

Pike worked for Watt Stopper until his resignation, which was effective April 13, 2018. CC 56.1 ¶ 19. According to the terms of Pike's Employment Agreement, Pike became an at-will employee on January 1, 2017. *Id.* ¶¶ 19-20. At the time of his resignation, Pike returned a laptop to Watt Stopper. *Id.* ¶ 23. Before he did so, however, he copied certain files from that laptop onto a flash drive, which he subsequently provided to counsel for AIC for use in this litigation. *Id.* ¶¶ 24, 43 (the extent of the files copied is disputed). Pike additionally disclosed certain Watt Stopper files saved on digital Dropbox servers to counsel for AIC for use in this litigation. *Id.* ¶¶ 25-28, 42.

In his Employment Agreement, Pike agreed to "to deliver to [Watt Stopper] at the termination of his employment or at any other time the Company may request, all Company property, including, but not limited to, Confidential Information which he then may possess or have under his control." Pike Employment Agreement § 3.1. Pike further agreed that he would "not, at any time, whether during the Term of [the Employment Agreement] or otherwise . . . reveal, divulge or make known to any person or entity (other than [Watt Stopper]) or use for his own account, any . . . Confidential Information . . . ." *Id.* The Watt Stopper files that Pike disclosed to counsel for AIC contained "Confidential Information" as that term is defined in Pike's Employment Agreement. CC 56.1 ¶ 42. By August 20, 2018 counsel for the parties had conferred regarding this issue, and all files which Watt Stopper considered to be confidential had been deleted or returned. 56.1 ¶¶ 33-34.

Watt Stopper asserts that these facts constitute another breach of Pike's Employment Agreement, which again triggered the Conditions on Royalties Clause, and therefore terminated Watt Stopper's royalty obligations, to the extent any remained, as of April 13, 2018. *See* TLA at 3.

In its motion for summary judgment, AIC contends that it cured any breach within the

notice period provided by the TLA, preventing the application of the Conditions on Royalties Clause. AIC's Br., Dkt. No. 98 at 8-9. However, the TLA does not provide any such applicable notice period. Accordingly, for the reasons that follow, AIC's motion is denied in this respect.

AIC points to § 8(C) of the TLA which states: "Either Party may terminate this Agreement if the other Party materially breaches this Agreement, and fails to cure such material breach within sixty (60) days after receiving written notice thereof." On that basis AIC contends that the TLA provided them with 60 days to cure any breach of the TLA.

AIC's argument is premised on the incorrect assumption that triggering the Conditions on Royalties Clause terminates the TLA, or constitutes a breach of the TLA, and therefore that § 8(C) is applicable. The TLA, however, contains no language to that effect. As described above, the Conditions on Royalties Clause, when triggered, terminates Watt Stopper's obligation to pay royalties and renders all licenses granted by AIC fully paid—it does not terminate the agreement as a whole, nor grant any party the right to do so. Nor is the TLA breached as a result of the self-execution of the Conditions on Royalties Clause. Indeed, such a reading is contrary to the language of the Conditions on Royalties Clause, which uses the phrase "as of that date" to indicate that, if a covered employee were to breach his employment agreement, then the Conditions on Royalties Clause would be automatically triggered "as of that date"—not 60 days following notice as AIC contends.[13]

Accordingly, as AIC's motion for summary judgment is premised on the existence of an applicable notice period for which the TLA does not provide, AIC's motion for summary judgment

---

[13] AIC further contends that "practically speaking" the Conditions on Royalties Clause terminates the TLA because it has such sweeping consequences. Divorced as it is from from the language of the TLA, the Court is not swayed by that purely functionalist and outcome-determinative argument. *Greenfield*, 98 N.Y.2d at 569 ("The best evidence of what parties to a written agreement intend is what they say in their writing.").

is denied in this respect.

### C. Reasonable Efforts

In the Amended Complaint, AIC alleges that Watt Stopper owes it additional royalties because Watt Stopper did not use reasonable efforts to promote the Royalty Bearing Products, as defined in the TLA. Watt Stopper has moved for summary judgment on that issue, contending that the TLA does not contain an obligation to use reasonable efforts to promote the Royalty Bearing Products. For the reasons that follow, the Court cannot conclude that such an obligation is not implied within the TLA. Accordingly, to the extent Watt Stopper has moved for summary judgment on this basis, its motion is denied.

The TLA does not expressly require that Watt Stopper use reasonable efforts to market or otherwise promote the Royalty Bearing Products. Nonetheless, as first articulated in Justice Cardozo's famed opinion *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917), and confirmed by that case's progeny, New York law may imply into an agreement an obligation that a licensee must use reasonable efforts to exploit the licensed products, especially in circumstances in which the payment of royalties on the sale of licensed products is the only consideration given for an exclusive license. *Id.* at 91. Watt Stopper provides two arguments as to why such an implied covenant should not be read into the TLA: (1) the parties specifically contemplated including a reasonable efforts provision in the TLA and chose not to do so; and (2) AIC received consideration other than the payment of royalties, and thus the *Lady Duff-Gordon* rule does not apply. For the reasons that follow, the Court cannot conclude that either argument precludes the Court from implying a duty to use reasonable promotional efforts into the TLA, pursuant to *Lady Duff-Gordon* and its progeny.

During the negotiation of the TLA, AIC proposed the inclusion of the following clause:

> If Wattstopper/Legrand fails to *actively promote*, develop and market Royalty Bearing
> Products or decides to exit from the business affecting Royalty Bearing Products,

19

such that less than expected royalties are due under this Agreement to AIC, all of Wattstopper's right, title and interest in such Royalty Bearing Products shall revert to AIC.

56.1 ¶ 11 (emphasis added). It is undisputed that AIC proposed that language in an "attempt[] to protect itself against the possibility that Defendants would not use reasonable efforts to promote, develop, or market the Royalty Bearing Products *and* to address the circumstances of Watt Stopper not making sales equal to the amount that were projected." *Id.* (alteration in original) (internal quotation marks omitted) (emphasis added). Ultimately, the proposed term was not included in the TLA. The only term in the TLA which relates to the prospect of complete failure by Watt Stopper to promote the Royalty Bearing Products is § 8(E), which, as the quotation below indicates, only applies if Watt Stopper leaves the business entirely.

> If Wattstopper decides to exit from the business affecting Royalty Bearing Products prior to the end of the Royalty Period, AIC may propose to acquire Funded Improvements at fair market value or as otherwise may be negotiated . . .

TLA § 8(E).

On that factual predicate, Watt Stopper invokes *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195 (2001), for the proposition that New York law "will not imply a term [into a contract] where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms." *Id.* at 961. According to Watt Stopper, *Reiss* precludes implying a duty to use reasonable promotional efforts into the TLA. However, for the reasons that follow, the Court cannot conclude that *Reiss* is applicable to the facts established here.

Even assuming *arguendo* that *Reiss* controls, the facts here do not support Watt

Stopper's contention that *Reiss* precludes implying a duty to use reasonable promotional efforts into the TLA. The duty to reasonably promote sales of a licensed product, as implied into certain contracts by *Lady Duff-Gordon* and its progeny, is an implied contractual duty, not a remedy. The clause proposed by AIC during negotiations would not only have imposed a duty to "actively promote," but would also have created a specific remedy for failing to "actively promote"—reversion of the intellectual property at issue in the TLA to AIC. Accordingly, the Court has not been presented with undisputed evidence that the parties specifically rejected a contractual obligation to use reasonable promotional efforts. Rather, the parties rejected a clause which would have imposed an obligation to "actively"—as opposed to "reasonably"—promote the Royalty Bearing Products *and* that would have created a specific remedy as a result of any such breach. As a result, it is far from clear on this record why the parties rejected the proposed clause. For example, it may have been the case that Watt Stopper rejected the clause due to its imposition of an additional remedy, or because it imposed a duty to "actively" promote, which could be interpreted as going beyond the default *Lady Duff-Gordon* rule's implied obligation to use "reasonable" efforts. Accordingly, even if *Reiss* is presumed to control, there would be a question of material fact as to the precise rationale for the parties' rejection of the proposed clause.[14]

---

[14] The Court notes that Watt Stopper appears to have overread the extent to which *Reiss* displaces *Lady Duff-Gordon* in the context of contracts granting an exclusive license in exchange for royalties. The issue before the *Reiss* court was "whether warrants to purchase shares of stock of defendant corporation must be adjusted in light of a reverse stock split authorized by defendant corporation after plaintiffs received warrants." *Reiss*, 97 N.Y.2d at 197. In the course of determining that the contract at issue should not be adjusted by implying a term modifying the purchase price, the *Reiss* court cited *Lady Duff-Gordon* approvingly. *Id.* at 201 ("It may be that Reiss would be entitled to a remedy if Financial performed a forward stock split, on the theory that he did not intend to acquire nothing. We should not assume that one party intended to be placed at the mercy of the other (*Wood v. Duff-Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 [1917])." (internal quotation and quotation marks omitted)). Accordingly, as a general matter, *Reiss* did not displace *Lady Duff-Gordon* or its progeny. The Court need not opine further on the interaction between these cases, however, as *Reiss* does not apply to the facts here.

As to Watt Stopper's second argument, for the reasons that follow, Watt Stopper has failed to adduce evidence of additional consideration sufficient to preclude the implication of a reasonable duty to promote the licensed technology into the TLA.

Courts have been reluctant to imply a duty to use reasonable promotional efforts into contracts granting exclusive licenses when the agreement at issue provides for a substantial upfront payment or the payment of guaranteed royalties. *See, e.g.*, *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 169 (3d Cir. 2001) (applying New York law) ("[W]e cannot hold that it is necessary to imply an obligation to use reasonable efforts" when the agreement at issue guaranteed "a substantial minimum royalty payment totaling $4 million per year for three years."). On the other hand, "courts have, on occasion, implied a covenant requiring a licensee to exploit a license even when the licensor has received a guaranteed minimum royalty or upfront fee." *Palazzetti Import/Export, Inc. v. Morson*, 98-cv-722-FM, 2001 WL 1568317, at *6-7 (S.D.N.Y. Dec. 6, 2001), *aff'd*, 54 F. App'x 698 (2d Cir. 2002) (collecting cases).

The evidence of additional consideration adduced by Watt Stopper falls well short of constituting, or being analogous to, a substantial guaranteed payment of royalties or an upfront payment sufficient to prevent an implied duty to use reasonable promotional efforts from arising. Watt Stopper claims that the TLA provides two additional categories of consideration to AIC beyond the payment of royalties: (1) the signing of a separate agreement (the "OEM Agreement") which required payments to AIC, and (2) the hiring of AIC employees by Watt Stopper. For the reasons articulated below, the Court cannot conclude as a matter of law that those categories of consideration preclude the implication of a duty to use reasonable promotional efforts into the TLA.

The TLA provides that Watt Stopper's "obligation to pay the Royalty hereunder shall be subject to AIC's contemporaneous execution of the OEM Agreement with Wattstopper . . . ." TLA § 2. That language unambiguously establishes that Watt Stopper's royalty obligations are conditioned on AIC's execution of the OEM Agreement. It follows that the execution of the OEM Agreement is consideration provided, at least in part, for Watt Stopper's benefit. Furthermore, while the OEM Agreement requires Watt Stopper to pay AIC for ancillary services and rental space, the TLA only anticipates the execution of the OEM Agreement, it does not require that the OEM Agreement have any particular terms. *See* TLA at 3; OEM Agreement § 13, Ex. AA. On those facts, the Court cannot conclude as a matter of law that the execution of the OEM Agreement is sufficiently analogous to a substantial upfront payment or a guaranteed royalty, which are the types of consideration courts have held to be sufficient to preclude the implication of a duty to use reasonable promotional efforts into certain contracts pursuant to *Lady Duff-Gordon* and its progeny. *See, e.g.*, *Emerson Radio Corp.*, 253 F.3d at 169.

And as for the hiring of AIC employees, the language of the Conditions on Royalties Clause unambiguously establishes: (1) that Watt Stopper anticipated hiring those employees in order to benefit from their "know-how" of the licensed technology, and (2) Watt Stopper's right to terminate royalty payments in the event the conduct of those employees breached their respective Employment Agreements such that Conditions on Royalties Clause was triggered.

> . . . [B]ecause the know-how associated with the Licensed Technology is anticipated to be shared hereunder by certain key persons currently employed by AIC but anticipated hereunder to be offered employment by Wattstopper, it shall be a condition hereunder that AIC hereby acknowledge and agree . . . that if any of Bryan Pike, Joe Dylinski, or Zane Brown resigns from their employment with Wattstopper without Wattstopper's consent prior to the third anniversary of the Effective Date,

23

or breach their employment obligations . . . then as of that date sales by Wattstopper of Royalty Bearing Products will be royalty free and all licenses granted by AIC hereunder will be fully paid.

TLA at 3. In that context, the hiring of those employees, which directly benefitted Watt Stopper and, at most, indirectly benefited AIC, is not at all similar to a substantial upfront payment or guaranteed royalty. In sum, the evidence of consideration adduced by Watt Stopper does not establish as a matter of law that a minimum royalty was owed, or that AIC was otherwise provided with consideration otherwise sufficient to preclude the implication of a duty to use reasonable promotional efforts into the TLA.

For all these reasons, on this record the Court cannot conclude that the TLA does not contain an implied obligation that Watt Stopper use reasonable efforts to promote the Royalty Bearing Products—with the corollary that to the extent Watt Stopper's motion for summary judgment is premised on such a finding, that motion is denied.

### D. Expert Testimony Regarding "Functionally Equivalent Successor Products"

At issue in this case is whether certain Watt Stopper products are "functionally equivalent successor products" as defined in the TLA. TLA at 4. Despite the technological complexity involved in comparing AIC's products with the purported "functionally equivalent successor products," AIC chose not to procure and notice any expert testimony to support its claims. Accordingly, for the reasons which follow, to the extent that AIC's claims are contingent on such comparisons, AIC is unable to bear its burden of persuasion.

The TLA defines "Royalty Bearing Products" as:

. . . the products set forth in Exhibit A [to the TLA] and functional [sic] equivalent successor products. As used in the preceding sentence "functionally equivalent successor products" means (i) products on Exhibit A that are re-named or re-branded without material change to their features of functionality, (ii) products that are re-configurations of the same technology (same feature/functionality) as products on Exhibit A but not (iii) battery operated single digital or analog input or

24

"single point" products.

TLA at 4. AIC alleges that Watt Stopper was contractually required to pay AIC royalties on certain wireless products in Watt Stopper's digital light management line ("wireless DLM products") because those products are "are re-configurations of the same technology (same features /functionality) as the products on Exhibit A."[15] *Id.*

The wireless DLM products that AIC contends are functionally equivalent successor products are identified as follows: LMBR-600, LMBC-600, LMRC-611MCC, LMDL-600-LMDM-601; LMPC-600, LMPX-600, and LMSW-605. 56.1 ¶ 27. It is undisputed that the wireless DLM products at issue are not "products on Exhibit A that are re-named or re-branded without material change to their features of functionality." 56.1 ¶ 30. Accordingly, the wireless DLM products are only Royalty Bearing Products if they are "re-configurations of the same technology (same feature/functionality) as products on Exhibit A but [are not] battery operated single digital or analog input or 'single point' products." TLA at 4.

AIC concedes that "LMDL-600, LMPC-600, and LMPX-600 are battery operated single digital or analog input products." 56.1 ¶ 32. Accordingly, the clear terms of the TLA indicate that those products are not Royalty Bearing Products and accordingly summary judgment must be granted to Watt Stopper with respect to those products.

As to the remaining products, at trial AIC would bear the burden of demonstrating that

---

[15] The meaning of the phrase "re-configurations of the same technology (same feature/functionality) as products on Exhibit A" is disputed—with both parties claiming that the phrase is ambiguous. The Court disagrees. The contractual language clearly and unambiguously refers to "reconfigurations of the same technology" and then provides the parenthetical phrase "(same feature/functionality)" to inform the reader of factors that are relevant to the determination of whether a product is a "reconfiguration of the same technology." TLA at 4.

However, as the Court has determined that AIC cannot bear its burden of persuasion as to whether any term is a "functionally equivalent successor product" absent expert testimony, the Court need not, and does not, take any further position as to the impact of AIC's erroneous proposed construction of this term on their claims.

those products are "functionally equivalent successor products." However, they have failed to procure an expert who can opine on this topic. For the reasons that follow, that failure is fatal to their claim.

While "there is no categorical rule requiring expert testimony . . . . [g]enerally speaking, it is needed when the facts and concepts of a case are beyond a layperson's understanding." *S.E.C. v. Ginder*, 752 F.3d 569, 575 (2d Cir. 2014). The issues which would be presented to the jury, were this case to proceed to trial, would go well beyond a layperson's understanding. In order to determine if a wireless DLM product was a Royalty Bearing Product, the jury would need to resolve at least the following three categories of evidentiary issues: (1) the nature of the technology involved in the AIC products, including those products' features and functions; (2) the nature of the technology involved in allegedly royalty-bearing Watt Stopper products, including those products' features and functions; and (3) a comparison of the technology at issue to determine whether any Watt Stopper product qualifies as a "functionally equivalent successor product." TLA at 4. As the issues presented are technical in nature, and involve comparing various technological features and functionalities, the Court draws on patent jurisprudence to determine whether expert testimony is necessary to decide any of the issues presented.[16]

"[N]o expert opinion [is] required . . . [when] the technology [is] 'easily understandable.'" *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 (Fed. Cir. 2010) (quoting *Centricut, LLC v. Esab Group,*

---

[16] In particular, the Court finds the issue of "obviousness" in the patent context to be closely analogous to the issues at bar here. A determination of obviousness requires analysis of the invention, the prior art, and a determination of whether the development of the invention would be obvious to a practitioner of the art. *See* 35 U.S.C. § 103 ("A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.") Analogously, a determination that a product is a reconfiguration of the same technology would require analysis of the wireless DLM product at issue's technology, the listed Royalty Bearing Product's technology, a comparison of the technology in the one to the other, and a determination of whether one product was a "functionally equivalent successor product" of the other.

*Inc.*, 390 F.3d 1361, 1369 (Fed. Cir. 2004)). "However, as [the Federal Circuit] noted in *Centricut*, 'expert testimony regarding matters beyond the comprehension of laypersons is sometimes essential,' particularly in cases involving complex technology." *Id.* at 1240 n.5 (quoting *Centricut*, 390 F.3d at 1369-70 (requiring expert testimony to establish infringement)); *see Asia Vital Components Co. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1011-12 (N.D. Cal. 2019) ("The Federal Circuit has explained that 'cases involving complex technology' may require expert testimony 'to establish . . . the existence (or lack thereof) of a motivation to combine references.' But it has declined to adopt 'a per se rule that expert testimony is required to prove infringement when the art is complex.'") (alteration in original) (quoting *Wyers*, 616 F.3d at 1240 n.5, and *Centricut*, 390 F.3d at 1370).

In the *Asia Vital Components Co.* case cited above, the Northern District of California, in determining that the technology at issue in that case was sufficiently complex that it necessitated expert testimony, compiled an illuminating survey of the Federal Circuit's treatment of this issue.

> [T]he technologies here are more complex than in the cases cited [in opposition to the need for expert testimony]. *See Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1371 (Fed. Cir. 2011) (manual lighters); *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1365 (Fed. Cir. 2008) (single patent claim involving retractable tarp); *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1276 (Fed. Cir. 2004) (screw anchors and metal brackets). The technology embodied in the [patent at issue's] system of cooling computer components is instead comparable to other cases that have required expert testimony regarding motivation. *See, e.g., Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) (devices using "a seal capable of maintaining negative pressure" and "draining fluids" to treat wounds); *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1259, 1267 (Fed. Cir. 2008) ("device used for calibrating drug delivery devices" comprised of "a housing," "a spray pump actuator," "an illumination device," and "an imaging device," each serving various mechanical functions). The Court concludes that "this subject matter is sufficiently complex to fall beyond the grasp of an ordinary layperson." *Proveris Sci. Corp.*, 536 F.3d at 1267.

*Id.* at 1012. The Court finds that framework persuasive and adopts it.

The wireless DLM products integrate multiple layers of technology in what can be described as "stacks." *See* 56.1 ¶ 29. Their features include "wirelessly control[ling] lighting loads," "sens[ing]

light level[s]," communicating requested or sensed light levels "wirelessly to another device," and determining the "occupancy status of a room." AIC's Resp. to Am. Inter. 16, Dkt. No. 95-13 at 3-6. Applying the *Asia Vital Components Co.* framework described above, the Court observes that the technology at issue here is multifunctional, involves digital and programmable features, and is designed to wirelessly synergize and communicate with other products. Accordingly, the technology at issue is not analogous to products such as "screw anchors" or "retractable tarp[s]" where a lay juror could reasonably be expected to make the necessary determinations without the benefit of expert testimony. *Asia Vital Components Co.*, 377 F. Supp. 3d at 1012. Rather, these products are more similar to a multi-functional medical device or a "system for cooling computer components," *id.*, which are "beyond a layperson's understanding" without expert testimony. *Ginder*, 752 F.3d at 575. Comparing the technology at issue in such products is similarly beyond the ken of a lay juror.

Expert discovery closed on November 12, 2018, and despite an extension of the expert discovery period, AIC has not adduced any expert testimony regarding whether any of the wireless DLM products in question here is a "functionally equivalent successor product." TLA at 4. For the reasons articulated above, without the benefit of expert testimony AIC cannot bear its burden of persuasion as to the question of whether any product at issue is a "re-configurations of the same technology (same feature/functionality) as products on Exhibit A" of the TLA. *Id.*

### 1. Lay Testimony

AIC's contention that it can bear its burden of persuasion through lay testimony is unavailing. According to AIC, the lay testimony of Zane Brown, the developer of the AIC products at issue, together with the lay testimony of Jonathan Cartrette, who oversaw the development of the Watt Stopper products at issue, would be, in combination, sufficient to bear its burden. However, for the reasons that follow, neither man's lay testimony could be admitted to the extent necessary to

bear AIC's burden.

"Lay opinion under Rule 701 must be limited to opinions that 'result[ ] from a process of reasoning familiar in everyday life.'" *United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013) (alteration in original) (quoting the Fed. R. Evid. 701 advisory committee's note to the 2000 amendment). Lay testimony is limited to testimony that is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). "[T]he purpose of Rule 701(c) is 'to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'" *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) (quoting the Fed. R. Evid. 701 advisory committee's note to the 2000 amendment).

In order for Brown's and Cartrette's testimony to carry AIC's burden of persuasion, they would need to testify as to the nature of the technology at issue and the similarities and differences between the technology in the AIC and Watt Stopper products. That testimony would not "result[ ] from a process of reasoning familiar in everyday life," *Cuti*, 720 F.3d at 459 (alteration in original), but instead would reflect their "scientific, technical, or other specialized knowledge," Fed. R. Evid. 701(c); *see United States v. Natal*, 849 F.3d 530, 536-37 (2d Cir. 2017) (holding that testimony as to "how cell phone towers operate" was, at least in part, improperly introduced through a lay witness). Accordingly, it would not be properly admitted as lay testimony.

The cases AIC cites in support of its position are inapposite. AIC cites *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 635 (S.D.N.Y. 2014), for the proposition that "co-founders of a technology can, without being designated as an expert, testify as to the features and functionality of the software system they created based on their personnel knowledge." Pl.s' Opp. at 18. In order to bear its burden of persuasion, however, AIC must adduce evidence as to how the "technology" at

issue was developed and operates in order to demonstrate that it was a "functionally equivalent successor product," TLA at 4, not merely as to the features and functionality of that technology. *See supra* n.16. Indeed, in allowing the lay testimony in question, the *523 IP LLC* court observed that the testimony did not involve "any technical or other specialized knowledge, such as software coding or computer systems functionality." *523 IP LLC*, 48 F. Supp. 3d at 635 (internal quotation marks omitted). Without that type of detailed technical testimony, however, AIC cannot bear its burden of persuasion—and accordingly *523 IP LLC* does not support AIC's position.[17]

For all these reasons, to the extent Watt Stopper seeks summary judgment on the basis of AIC's inability to prove at trial that any product is a "functionally equivalent successor product" due to lack of expert testimony, its motion is granted.

## E. Expert Testimony as to Reasonable Efforts to Promote Royalty Bearing Products

Watt Stopper also contends that it is entitled to summary judgment because AIC has failed to adduce expert testimony regarding the applicable standard for determining whether Watt Stopper's efforts to promote the Royalty Bearing Products were reasonable. For the reasons that follow, Watt Stopper's motion for summary judgment is denied in this respect.

"[T]he necessity of expert testimony depends on circumstances, and . . . there is no categorical rule requiring expert testimony . . . . Generally speaking, it is needed when the facts and concepts of a case are beyond a layperson's understanding." *Ginder*, 752 F.3d at 575. "It is well

---

[17] AIC also cites *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009) for the proposition that "[w]hen a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702." In that case, the Third Circuit held that a lay witness's testimony about her future pay was improperly admitted under Rule 701. Even assuming, *arguendo*, the applicability of the case, it at most stands for the proposition that Brown and Cartrette might be permitted to offer lay testimony as to the features or functions of a given product—but not the operation of the technology that facilitated those features and functions. *See* Fed. R. Evid. 701(c).

settled that expert testimony is unnecessary in cases where jurors 'are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'" *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).

Watt Stopper contends that what constitutes reasonable promotional efforts in the "commercial lighting controls industry is beyond a layperson's understanding." Watt Stopper's Br., Dkt No. 93 at 13. However, Watt Stopper has failed to adduce evidence that the commercial lighting control industry is sufficiently complex to mandate the use of expert testimony to determine whether Watt Stopper's promotional efforts were reasonable.

As discussed in § II(D) above, the technology at issue in this case is sufficiently complex that expert guidance is required to assist the jury in determining if one product is a "functionally equivalent successor product" of another. That is because, *inter alia*, the products themselves involve complex technology, and comparison of the features, functionalities, components, and other aspects of those products at issue to determine if they were "functionally equivalent" is beyond the ken of a lay juror.

Plaintiff can prove its claim with evidence of an absence of any efforts to promote the products, which would not require expert testimony. At minimum, a duty to use reasonable efforts to promote "requires that the promising party undertake at least some activity." *Holland Loader Company, LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 473 (S.D.N.Y. 2018). The corollary of this basic principle is that if AIC adduces evidence at trial that Watt Stopper undertook *no* promotional efforts, a jury could reasonably find that Watt Stopper had failed to use reasonable efforts to promote the products at issue. Such evidence would not require the testimony of an expert. Because AIC might support its claim with evidence of a lack of any efforts by Watt Stopper, this

element of Watt Stopper's motion must be denied.

Watt Stopper argues that because the products at issue are complex to install, may be custom built, and the sales force tasked with selling them received additional training on how to sell those products, that promotion of those products is an area "beyond a layperson's understanding." *Ginder*, 752 F.3d at 575. Notably, however, the cases cited in support of that proposition discuss industries in which a determination of whether promotional efforts were reasonable would be far more complex than in this case. *E.g.*, *Musket Corp. v. Suncor Energy (U.S.A.) Mktg., Inc.*, H-15-100, 2017 WL 896510, at *6 (S.D. Tex. Mar. 7, 2017) (applying New York law) (expanding a rail terminal sufficient to accept certain quantities of crude oil); *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 381 (S.D.N.Y. 2014) (bringing a breast cancer diagnostic assay to market in the FDA-regulatory context).

For all these reasons, the Court has not been presented with an adequate factual or legal basis to conclude that the question of whether Watt Stopper's promotional efforts were reasonable is "beyond a layperson's understanding." *Ginder*, 752 F.3d at 575. Accordingly, on this record, the Court cannot conclude that expert testimony is necessary for AIC to bear its burden of persuasion as to that issue. As such, to the extent Watt Stopper's motion for summary judgment is premised on the requirement that AIC must adduce expert testimony to demonstrate that Watt Stopper did not engage in reasonable promotional efforts, Watt Stopper's motion is denied.

### F. Patent Expiration

Watt Stopper has argued that it is entitled to partial summary judgment under *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), and its progeny due to the expiration of the last remaining patent licensed to Watt Stopper pursuant to the TLA on March 19, 2017. AIC reinstated that patent at or around January 17, 2019. As the lapse of that patent was a necessary factual predicate for Watt Stopper's *Brulotte* argument, the reinstatement of that patent effectively moots that aspect of Watt Stopper's

motion.[18]  Accordingly, to the extent Watt Stopper's motion for summary judgment asserts that no

royalties are owed under a *Brulotte* theory, its motion is denied.

### G.  Declaratory Judgment

In its Counterclaims, Watt Stopper seeks declaratory judgment that its royalty obligations

terminated at the time of any breach of Pike's or Dylinski's respective Employment Agreements,

that Watt Stopper is owed repayment of any royalties paid after the Conditions on Royalties Clause

went into effect, that all sales of Royalty Bearing Products are royalty-free and all licenses granted to

Watt Stopper by the TLA are fully paid, and that Watt Stopper is entitled to the return of all of its

property in Pike's or AIC's possession, custody, or control.  CC ¶¶ 35-39.

Watt Stopper has moved for partial summary judgment as to its declaratory judgment

counterclaim, contending that the undisputed evidence establishes that the Conditions on Royalties

Clause was triggered by Pike's and Dylinski's respective breaches of their Employment Agreements,

terminating Watt Stopper's royalty obligation.  AIC has also moved for summary judgment as to the

declaratory judgment counterclaim, contending that Watt Stopper's royalty obligation never

terminated.  As the Court has concluded above, however, questions of material fact persist as to

whether Watt Stopper's royalty obligation was terminated or survived.  Accordingly, both motions

for summary judgment are denied to the extent those motions are reliant on a dispositive

determination of whether Watt Stopper's royalty obligation was terminated.

The Court understands, as discussed in § III(B) above, that Pike has returned or deleted all

Watt Stopper property in his possession, custody, or control.  Accordingly, the Court considers the

request for declaratory judgment that Pike must return any such property to no longer be germane.

---

[18] The Court has separately considered, and denied, Watt Stopper's motion for sanctions and associated relief due to the reinstatement of the patent. *See* Order Denying Motion for Sanctions, Dkt. No. 149.

33

### H. Tortious Interference

Watt Stopper's theory of its tortious interference claim is that AIC induced the breaches of the Employment Agreements, which triggered the Conditions on Royalties Clause, and which, in turn, caused Watt Stopper to overpay royalties to AIC, harming Watt Stopper. AIC has moved for summary judgment on this claim. However, AIC's argument is premised on its contention that Watt Stopper's royalty obligation never terminated. For the reasons stated above, however, there is a question of material fact whether Watt Stopper's royalty obligations terminated due to breaches of Pike's and Dylinski's Employment Agreements. As the Court cannot determine on this record whether Watt Stopper's royalty obligation survived or was terminated, there is necessarily a question of material fact as to whether Watt Stopper overpaid AIC. Accordingly, AIC's motion for summary judgment on the tortious interference counterclaim is denied.

While this issue is decided, and the Court need not, and does not, take any further position on it, in dicta, the Court notes certain concerns regarding Watt Stopper's tortious interference claim. First, the Court notes what appears to be a logical flaw in Watt Stopper's theory. In order to state a claim for tortious interference with contract under New York law, plaintiffs must demonstrate "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, *and damages resulting therefrom*." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) (citing *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120 (1956)) (emphasis added). Assuming *arguendo* that AIC tortiously induced Pike and Dylinski to breach their Employment Agreements, triggering the Conditions on Royalties Clause, the result of those actions would be to terminate Watt Stopper's obligation to pay royalties. That chain of events would seem to benefit, not harm, Watt Stopper. To the extent Watt Stopper paid royalties, despite being under

no obligation to do so, it does not necessarily follow that any such payments resulted from AIC's alleged tortious actions. Rather, to the extent that Watt Stopper knew of any such breach, it may be the case that Watt Stopper's voluntary decision to pay royalties, in the absence of an obligation to do so, was the cause of any injury suffered by Watt Stopper, not any alleged action by AIC. As this issue has not been raised, however, the Court ultimately takes no position on it.

Second, the Court notes that Watt Stopper's claim that it was harmed by its overpayment of royalties is in tension with its arguments that there was no waiver within the context if § 15-301. *See* § III(A) and n.10, above. The Court questions if Watt Stopper is attempting to have it both ways— if the payments were voluntary, it may be the case that they were not "unequivocally referable" to a modification of the TLA. On the other hand, if Watt Stopper continued to make the royalty payments specified in the TLA, knowing that its obligation to do so had terminated—those actions may be pertinent to a determination of whether those payments were unequivocally referable to a modification of the TLA.

## IV.    CONCLUSION

For the reasons articulated above, Watt Stopper's motion for summary judgment as to the Complaint is GRANTED IN PART and DENIED IN PART, and AIC's motion for summary judgment as to the Counterclaims DENIED.

Watt Stopper is granted summary judgment as to AIC's claims to the extent those claims any are reliant on a determination that any given product is a "functionally equivalent successor product." Watt Stopper is also granted summary judgment as to AIC's claims to the extent those claims relate to products bearing the model numbers LMDL-600, LMPC-600, and LMPX-600. In all other respects, the parties' motions for summary judgment are denied.

The Court understands that Watt Stopper's counterclaim for declaratory judgment that Pike

is obligated to return all Watt Stopper property in his possession, custody, or control is no longer germane.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 92 and 97.

SO ORDERED.

Dated: September 9, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge